## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## CIVIL NO. 3:08CV508-FDW-DSC

|  |  |  |
|---|---|---|
| **DONNA M. THOMAS,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **MEMORANDUM AND RECOMMENDATION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social** | ) | |
| **Security Administration,** | ) | |
| **Defendant.** | ) | |
| | ) | |

**THIS MATTER** is before the Court on the Plaintiff's "Motion for Summary Judgment"

(document #8) and "Brief" (document #9), both filed March 17, 2009; and the Defendant's "Motion

for Summary Judgment" (document #10) and "Memorandum in Support of the Commissioner's

Decision" (document #11), both filed April 1, 2009. This case has been referred to the undersigned

Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), and these motions are now ripe for

disposition.

Having considered the written arguments, administrative record, and applicable authority,

the undersigned will respectfully recommend that Plaintiff's Motion for Summary Judgment be

denied; that Defendant's Motion for Summary Judgment be granted; and that the Commissioner's

decision be affirmed.


## I. PROCEDURAL HISTORY

Sometime in October 2002, the Plaintiff filed an application for a period of disability, Social

Security disability benefits ("DIB"), and Supplemental Security Income ("SSI"), alleging she was

unable to work as of September 12, 2002 as the result of a pulmonary condition, including a

collapsed lung (Tr. 58, 70, 402). The Plaintiff's claim was denied initially and upon reconsideration.

The Plaintiff filed a timely Request for Hearing, and on July 26, 2006 a hearing was held before an Administrative Law Judge ("ALJ"). In a decision dated October 24, 2006, the ALJ denied the Plaintiff's claim, finding that the Plaintiff had not engaged in substantial gainful activity since her alleged onset date; that the Plaintiff suffered a number of non-severe impairments including scoliosis, reflux disease, allergies, sinusitis, and irritable bowel disease; that the Plaintiff suffered from pulmonary nodules with a history of a collapsed lung, major depression, and generalized anxiety which were severe impairments within the meaning of the regulations, but did not meet or equal any listing in 20 C.F.R. Pt. 404, Subpt. P, App. 1; that the Plaintiff could not perform any of her past relevant work; and that the Plaintiff retained the Residual Functional Capacity ("RFC")[1] to perform work at the sedentary, light, and medium exertional levels.[2] The ALJ also found that because of her major depression and generalized anxiety, she was limited to performing unskilled work. The ALJ concluded, however, that based on the Medical-Vocational guidelines ("the Grid" or "the Guidelines") and considering the Plaintiff's RFC together with her age, education and past work experience, there were jobs existing in significant numbers in the national economy that Plaintiff could perform and therefore she was not disabled.

---

[1]The Social Security Regulations define "residual functional capacity" as "what [a claimant] can still do despite his limitations." 20 C.F.R. § 404.1545(a). The Commissioner is required to "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b).

[2]"Medium" work is defined in 20 C.F.R. § 404.1567(c) as follows:

Medium work. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work.

By notice dated September 8, 2008, the Appeals Council denied the Plaintiff's request for further administrative review.

The Plaintiff filed the present action on November 6, 2008. On appeal, the Plaintiff assigns error to the ALJ's determinations concerning her mental and emotional impairments, the combined effect of her severe and non-severe impairments, her subjective complaints of pain, and whether testimony from a Vocational Expert ("VE") was required to establish the existence of a significant number of jobs that the Plaintiff could perform. See Plaintiff's "Brief" at 1-2 (document #9). The parties' cross-motions for summary judgment are ripe for disposition.

## II. STANDARD OF REVIEW

The Social Security Act, 42 U.S.C. § 405(g) and § 1383(c)(3), limits this Court's review of a final decision of the Commissioner to: (1) whether substantial evidence supports the Commissioner's decision, Richardson v. Perales, 402 U.S. 389, 390, 401 (1971); and (2) whether the Commissioner applied the correct legal standards. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); see also Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). The District Court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986); King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

As the Social Security Act provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986), quoting Richardson v. Perales, 402 U.S. 389, 401 (1971), the Fourth Circuit defined "substantial evidence" thus:

> Substantial evidence has been defined as being "more than a scintilla and do[ing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

See also Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976) ("We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence").

The Fourth Circuit has long emphasized that it is not for a reviewing court to weigh the evidence again, nor to substitute its judgment for that of the Commissioner, assuming the Commissioner's final decision is supported by substantial evidence. Hays v. Sullivan, 907 F.2d at 1456 (4th Cir. 1990); see also Smith v. Schweiker, 795 F.2d at 345; and Blalock v. Richardson, 483 F.2d at 775. Indeed, this is true even if the reviewing court disagrees with the outcome – so long as there is "substantial evidence" in the record to support the final decision below. Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## III. DISCUSSION OF CLAIM

The question before the ALJ was whether at any time the Plaintiff became "disabled" as that term of art is defined for Social Security purposes.[3] Relevant to the Plaintiff's mental and emotional impairments within the applicable time period, the Plaintiff sought mental health care on December 12, 2002, when she went to Spartanburg Area Mental Health Center with complaints of stress,

---

[3]Under the Social Security Act, 42 U.S.C. § 301, et seq., the term "disability" is defined as an:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

Pass v. Chater, 65 F. 3d 1200, 1203 (4th Cir. 1995).

anxiety, and depression (Tr. 248-253). The Plaintiff reported having problems in the past with her "nerves," and at that time, she reported crying spells related to illnesses suffered by her step-father and her best friend (Tr. 248). The Plaintiff's attitude and mood were sad, depressed, anxious, and isolative but her insight was good and her speech was normal. The Plaintiff was fully oriented; her intellectual functioning was fair; concentration and calculation were intact; and her thought process was relevant, congruent, and logical. Although she complained of "poor memory," she was able to recall past events (Tr. 250). The Plaintiff reported that she had good mobility, was able to drive, was good at cleaning her house, and that caring for her children helped her get through the day (Tr. 251). Plaintiff was diagnosed with severe, recurrent major depression and her global assessment of functioning ("GAF") was rated at 58[4] (Tr. 252). Individual treatment sessions were recommended (Tr. 251).

In January 2003, Dr. Cathcart noted that the Plaintiff wanted to improve her coping skills and that she exhibited symptoms of sadness, tearfulness, low energy, and sleeping too much, but that otherwise, except for financial stress, she seemed to be doing fairly well (Tr. 258). He prescribed Lexapro (Tr. 258). Later that month, the Plaintiff complained of visual hallucinations from the medication but her crying spells had decreased (Tr. 255). In February, the Plaintiff's medication was changed to Paxil (Tr. 261). In March 2003, it was again noted that the Plaintiff reported that she was able to take care of her home and family (Tr. 263).

In May 2003, Dr. Horn, a psychological consultant, evaluated the impact of Plaintiff's

---

A GAF rating that is between 51 and 60 is indicative of an individual with moderate, that is, nondisabling, psychological symptoms or moderate difficulty in social, occupational, or school functioning (Tr. 253). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994). The higher the rating within a given range the less severe is the difficulty.

affective disorder (Tr. 130-145). The only functional areas in which Dr. Horn indicated any significant limitations were understanding, remembering, and carrying out detailed instructions and interacting appropriately with the general public, and even these limitations were only "moderate" (nondisabling) (Tr. 144-145). Dr. Horn concluded that although the Plaintiff's psychiatric impairment was severe, it did not preclude simple routine work away from the public (Tr. 142).

In September 2003, the Plaintiff reported that she was not taking any medication for her nerves (Tr. 108).

In December 2003, Dr. Markowitz wrote a note in which he stated that he had been the Plaintiff's treating psychiatrist since September 2003 (Tr. 268). He indicated that the Plaintiff had initially reported symptoms consisting of "mood swings," depression, anxiety, and irritability and that she later reported mild paranoia and auditory hallucinations (Tr. 268). He prescribed Paxil for her anxiety and depression and Seroquel to reduce auditory and visual hallucinations, although he indicated that there had "not been clear visual hallucinations." (Tr. 268). Dr. Markowitz did not provide any examination or treatment notes.

In February 2004, Dr. Cutchin indicated that he did not note any abnormality in the Plaintiff's insight, judgment, memory, mood, or affect (Tr. 312).

In December 2005, the Plaintiff was seen by Ann Shanker, a Family Nurse Practitioner at Ramesh Gihwala, M.D. & Associates, for complaints of problems with her "nerves," problems sleeping, overeating, and worrying (Tr. 368). Her illness was described as moderately severe; her diagnosis was recurrent moderate major depressive disorder; and, her GAF was rated at 55 (Tr. 368, 369). In March 2006, Plaintiff reported that she was depressed that morning due to family problems but also reported that she had been out of medication for a month (Tr. 363). The Plaintiff's mood

was described as normal, her affect was appropriate , and her thought process was intact. Her memory was unimpaired, but, she had moderate anxiety and depression (Tr. 363).

On February 7, 2006, the Plaintiff had a psychiatric evaluation at Carolina Psychiatric Associates (Tr. 394-398), during which she complained of a ten-year history of depression and reported having been hospitalized for depression two years earlier (2004)[5] (Tr. 394). The Plaintiff was described as depressed, crying, and angry (Tr. 396). She was diagnosed with major depression and a generalized anxiety disorder (Tr. 397). The Plaintiff did not return to Carolina Psychiatric Associates after her initial evaluation and receiving medications including lithium and Xanax (Tr. 397, 398).

On May 11, 2006, the Plaintiff underwent a psychiatric evaluation by Dr. Larry E. Cummings at Behavioral Wellness Center of Shelby for complaints about her "nerves" (Tr. 387-391). The chart reflects that the Plaintiff's mood was dysphoric and that her affect was tearful but that her cognitive functions were intact and there was no thought process disorder (Tr. 389). The diagnostic impression was that Plaintiff had recurrent, severe major depression and an anxiety disorder. Plaintiff's GAF was rated at 58 (Tr. 390).

On August 2, 2006, Dr. Cummings completed a medical opinion form regarding Plaintiff's ability to perform mental work-related activities (Tr. 399-400). As the Plaintiff concedes in her brief, he opined that her ability to perform semi-skilled or skilled work including understanding, remembering and carrying out detailed instructions and dealing with the stress of semi-skilled or skilled work was seriously limited, but <u>not</u> precluded (Tr. 400). With respect to the abilities and

---

[5] The record does not reflect such a hospitalization and the Plaintiff has not indicated such a recent psychiatric hospitalization except on this one occasion.

aptitudes needed to perform unskilled work, Dr. Cummings indicated that the Plaintiff's ability to maintain attention for two-hour segments, to maintain regular attendance and be punctual, to sustain an ordinary routine without extraordinary supervision, to work with or near others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to deal with normal work stress was seriously limited but not precluded. Moreover, Dr. Cummings also concluded that the Plaintiff's ability to ask questions and request assistance; to remember work-like procedures; to understand, remember, and carry out short, simple instructions; to make simple work-related decisions; to perform at a consistent pace without needing unreasonable rest periods; to accept instructions and criticism from supervisors; to get along with co-workers; and to respond appropriately to changes in the work routine was unlimited or limited but satisfactory (Tr. 399). Finally, Dr. Cummings opined that the Plaintiff would miss more than four days of work per month due to her mental and emotional impairments. Id.

As an initial matter, the Plaintiff purports to assign error to the ALJ's decision not to allow controlling weight to Dr. Cummings' opinion discussed above. The Fourth Circuit has established that a treating physician's opinion need not be afforded controlling weight. Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). A treating physician's opinion on the nature and severity of the alleged impairment is entitled to controlling weight only if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. See 20 C.F.R. §§ 404.1527(d)(2) (2002); and Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Therefore, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Mastro, 270 F.3d. at 178, citing Craig v. Chater, 76 F.3d 585, 590 (4th

Cir. 1996).

The Plaintiff does not explain how Dr. Cummings' conclusions would mandate a finding of disability. Indeed, Dr. Cummings concluded, as did every other mental health professional who examined the Plaintiff, that her GAF score (her overall function) was only in the moderately impaired, non-disabled range. The record is also clear that the Plaintiff did not seek regular mental health counseling. Although the Plaintiff's medication was effective to relieve at least some of her symptoms, she frequently stopped taking it. See Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994) ("an unexplained inconsistency between the claimant's characterization of the severity of her condition and the treatment she sought to alleviate that condition is highly probative of the claimant's credibility"); and Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling").

Dr. Cummings found, at most, that the Plaintiff had moderate, non-disabling limitations to her ability to perform skilled and semi-skilled work, restrictions that the ALJ adopted when he limited the Plaintiff's RFC to unskilled work. Dr. Cummings' conclusion in this regard is consistent with the other medical records and opinions, which indicate that the Plaintiff's depression and anxiety impact her ability to understand, remember, and carry out detailed instructions and limit her ability to perform semi-skilled and skilled work. However, they do not impact Plaintiff's ability to understand, remember, and carry out the type of short, simple instructions that are generally involved in unskilled work. Unskilled work needs little or no judgment to perform simple duties that can be learned on the job in thirty days or less and includes work in which the primary duties are handling, feeding machines, overbearing from machines, or tending machines. See 20 C.F.R. §§ 404.1568(a) and 416.968(a). To the extent that the record indicated that the Plaintiff had a

limitation in interacting with others, the ALJ correctly noted that most unskilled jobs involve working with objects rather than with people (Tr. 24).  See Social Security Ruling 85-15; see also 20 C.F.R. Part 404, Subpart P, Appendix 2, § 201.00(I).

   In evaluating a mental impairment, the ALJ is required to show the history of the condition and must include a specific finding as to the degree of limitation in activities of daily living, social functioning; concentration, persistence or pace; and episodes of decompensation.  See 20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).   The ALJ provided a summary of the examinations and treatment of Plaintiff's mental condition (Tr. 20-24).  Based upon a review and evaluation of all of this evidence, the ALJ agreed with opinions offered by Agency psychologists and found that Plaintiff's mental condition resulted in "mild" restrictions of daily activities , "moderate" difficulties in maintaining social functioning, and "moderate" difficulties in maintaining concentration, persistence or pace  and that "the record does not indicate that the claimant has had any episodes of decompensation of extended duration" (Tr. 24, 25 at Finding 7).   The ALJ applied the required standard in evaluating Plaintiff's depression and anxiety.   As detailed above, the ALJ properly weighed the evidence  and his finding that Plaintiff's depression and general anxiety limited her performance to unskilled work  is supported by the record.

   The Plaintiff next argues that in determining her RFC, the ALJ did not consider  the impact of her physical impairments, including her chronic scoliosis, allergies, reflux disease, sinusitis, and irritable bowel disease, as well as her pulmonary condition (Pl. Br. at 23-24); and that he failed to properly evaluate her subjective complaints (Pl. Br. at 21-22).  The undersigned concludes to the contrary that the ALJ also properly evaluated the functional impact of Plaintiff's physical impairments and that his finding that these allowed for performance of the full range of work at the

medium exertional level is supported by substantial evidence.

The Plaintiff was hospitalized for eight days in September 2002 as the result of a collapsed lung (Tr. 201-29). A chest tube was used to re-inflate the right lung but there continued to be an air leak (Tr. 201, 211, 212, 215). Five days later, surgery was performed to remove flaccid vesicles from the apex of the lung and seal the leak (Tr. 212-13).

In December 2002, Dr. Cutchin saw the Plaintiff for complaints of heartburn and noted that upon examining Plaintiff's lungs, he found no abnormalities(Tr. 231-33). He diagnosed esophagitis with reflux (Tr. 232). He saw the Plaintiff for a respiratory infection on December 23, 2002, and diagnosed acute bronchitis (Tr. 234). Over the next year, Dr. Cutchin continued to see the Plaintiff for annual PAP/pelvic and breast exams; chest pain without abnormal lung findings; urinary incontinence probably aggravated by a urinary tract infection; and sinusitis related to an upper respiratory infection (Tr. 235-41). The record does not show that any of these conditions continued for more than two months or that they significantly impacted Plaintiff's functioning.

A chest x-ray from February 2003 showed evidence of Plaintiff's lung surgery but no evidence of pneumothorax, definite blebs, or pulmonary or pericardial fluid (Tr. 302, 304). The lungs were well expanded and clear (Tr. 303, 305).

In April 2003, an Agency physician reviewed the Plaintiff's medical records and assessed the Plaintiff's physical RFC, concluding that she could perform a full range of medium level work with no postural or manipulative limitations (Tr. 122-29).

A chest x-ray performed in October 2003 was negative, indicating that Plaintiff's lungs were free of infiltrate or pleural fluid collection (Tr. 269).

In November 2003, Dr. Korn examined the Plaintiff in consultation (Tr. 264-67). The

Plaintiff reported breathing problems related to her previous collapsed lung and surgery, scoliosis, and back complaints resulting from a congenital leg length discrepancy (Tr. 264). On examination, the Plaintiff's respiratory rate was a little elevated but her lungs were clear to auscultation and Dr. Korn did not hear any rales, rhonchi, or wheezes (Tr. 265). The Plaintiff had a full range of motion and full strength in her upper and lower extremities, although there was a compensatory curvature of the spine at the lumbosacral junction as a result of an elevated right hip and decreased flexion of the back (Tr. 266).

In December 2003, the Plaintiff's pulmonary testing indicated a forced vital capacity ("FVC") of 3.44 liters without the use of any medication which was more than 100% of predicted level and a one-second forced expiratory volume ("$FEV_1$") of 2.40 liters which was 83% of predicted level (Tr. 242).

In December 2003, Dr. Cain reviewed Plaintiff's medical records and concluded that her shortness of breath and scoliosis were not severe impairments (Tr. 174).

Dr. Cutchin saw Plaintiff in January and February 2004 for complaints of abdominal pain related to gas and bloating, gastroesophageal reflux disease, an annual PAP/pelvic and breast exam, and a reported upper respiratory infection (Tr. 309-22). On examination, no pulmonary abnormality was detected (Tr. 310, 312, 316, 321). An upper GI study was negative (Tr. 315), and an abdominal ultrasound was unremarkable (Tr. 320).

An August 2004 pulmonary functioning test indicated an FVC of 3.48 liters without the use of any medication which was more than 100% of predicted level; an $FEV_1$ of 2.37 liters which was 82% of predicted level; and a total lung capacity that was 125% of the predicted level (Tr. 273, 277).

The Plaintiff was seen by Dr. Murphy of the Gastonia Medical Specialty Clinic on several

occasions from August through November 2004 (Tr. 270-88). She reported shortness of breath with walking but was not on any pulmonary medication (Tr. 272). In September, a chest x-ray was taken because of Plaintiff's complaints of chronic shortness of breath (Tr. 270). Lung volumes were described as probably adequate and showed evidence of the prior surgery and some scarring in the small tongue-like area of the lung that had not changed significantly from a month earlier (Tr. 270). Another x-ray in October yielded similar results (Tr. 271). Dr. Murphy's diagnosis with respect to Plaintiff's pulmonary condition was mild airflow obstruction without very much variability (Tr. 274). He started her on one puff of Pulmicort twice a day (Tr. 274).

In November 2004, Dr. Murphy reported that the Plaintiff's chest was relatively clear; a lung scan was negative for pulmonary embolic disease; EKG and stress test were relatively unremarkable; and a CT scan showed indeterminate pulmonary nodules in the left lung field, but no diffuse interstitial lung disease (Tr. 275).

In April 2005, Dr. Murphy noted that the Plaintiff had a small nodule in the upper lobe of her left lung but that her chest was relatively clear (Tr. 345). In September 2005, Plaintiff had mild mucosal thickening consistent with sinusitis in her right maxillary sinus (Tr. 335, 343). In October 2005, Dr. Murphy noted that Plaintiff was breathing somewhat better but had small bilateral pulmonary nodules that were probably benign (Tr. 340). In December 2005, an x-ray showed no evidence of acute cardiopulmonary process (Tr. 349).

Chest x-rays in March 2006 showed that Plaintiff's lungs were well inflated with no consolidation, effusion, or pneumothorax (Tr. 336). Chest x-rays taken in April 2006 showed normal pulmonary vascularity and no infiltrate (Tr. 338).

The ALJ properly found that Plaintiff's chronic scoliosis, occasional allergies, reflux disease,

13

sinusitis, and irritable bowel disease were not ongoing conditions that limited her functional capacity beyond the limitation to work at no more than the medium exertional level. The record of Plaintiff's treatment for these conditions, discussed above and which the ALJ considered, supports that finding. The Plaintiff has not indicated what additional limitations result from these conditions that the ALJ failed to include in her RFC, nor has she suggested that the record indicates any additional limitations.

The Plaintiff's assignment of error notwithstanding, the ALJ fully evaluated the impact of her pulmonary condition and any impairments of her functional capacity. The ALJ's RFC finding is a function-by-function evaluation of the impact of Plaintiff's impairments. The finding that Plaintiff had the ability to perform sedentary, light, or medium level work indicates that she had the ability to sit for about six hours in an eight-hour workday, to stand/walk for about the same length of time, and to lift and carry up to twenty-five pounds frequently and fifty pounds occasionally. Such a capability is consistent with the DDS assessment and no treating or examining source has indicated that Plaintiff lacks such a capacity. The ALJ's finding that Plaintiff could perform the "full range" of work at these exertional levels indicates that he did not find that Plaintiff had any postural, manipulative, visual, communicative, or environmental limitations. The record does not indicate that Plaintiff's physical impairments result in any non-exertional limitations that would impact the ability to perform sedentary, light, or medium level work.

The ALJ also properly applied the standard for determining a claimant's residual functioning capacity based on subjective complaints of pain and, in this case, the record contains substantial evidence to support the ALJ's conclusion that Plaintiff's testimony was <u>not</u> fully credible. The determination of whether a person is disabled by non-exertional pain or other symptoms is a two-step

process. "First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996), citing 20 C.F.R. § 416.929(b); and § 404.1529(b); 42 U.S.C. § 423(d)(5)(A). If there is such evidence, then the ALJ must evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [her] ability to work." Id. at 595, citing 20 C.F.R. § 416.929(c)(1); and § 404.1529(c)(1). The regulations provide that this evaluation must take into account:

> not only the claimant's statements about his or her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it.

Craig, 76 F.3d at 595 (citations omitted).

At the administrative hearing, the Plaintiff testified that due to her pulmonary impairment, she experienced right side pain more than five times each day lasting for twenty to thirty minutes at a time, requiring her to sit or walk during that period and not engage in any other activity (Tr. 443-45). She reported that she only gets one hour of sleep per night (Tr. 446). She did testify that she was able to sleep during the day. (Tr. 450).

The Plaintiff testified that she could only walk for five minutes before being out of breath (Tr. 453); that she could sit for less than an hour and even this would result in side pain (Tr. 454); that she could not stand for more than twenty or thirty minutes because of calf pain (Tr. 454); and that she could lift no more than eight pounds because of her pulmonary condition (Tr. 455-56). She

testified that the only household chore she performs is making her bed (Tr. 451-52); that she spends the majority of her day lying on the couch or in bed not engaging in any activity (Tr. 457); and that on most days she does not even get dressed (Tr. 443).

To the extent that this testimony would support a finding of functional limitations that were disabling, it was inconsistent with the Plaintiff's statements to her mental health providers that she had good mobility, was able to drive, was good at cleaning her house, and that caring for her children helped her get through the day (Tr. 251).

Moreover, the Plaintiff also testified that she drives her children to and from school (Tr. 449); that she goes to church most every Sunday (Tr. 450-51); that she did the grocery shopping most of the time, with her children helping her because she "can't lift heavy like dog food and stuff" (Tr. 449); that she usually does the cooking but that the family goes out to eat because she does not like to cook (Tr. 451); that although her daughter does the vacuuming, the Plaintiff does the mopping (Tr. 451); and that she puts laundry into the washing machine (Tr. 452).

The record contains evidence of Plaintiff's pulmonary nodules with a history of a collapsed lung, major depression, and generalized anxiety – which <u>could</u> be expected to produce some of the pain claimed by Plaintiff – and thus the ALJ essentially found that Plaintiff could satisfy the first prong of the test articulated in <u>Craig</u>. However, the ALJ also correctly evaluated the "intensity and persistence of [her] pain, and the extent to which it affects [her] ability to work," and found Plaintiff's subjective description of her limitations not credible.

"The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life." <u>Mickles</u>, 29 F.3d at 921, <u>citing</u> <u>Hunter v. Sullivan</u>, 993 F.2d 31 (4th Cir. 1992) (claimant's failure to fill prescription for painkiller, which itself was indicated for only mild

pain, and failure to follow medical and physical therapy regimen, supported ALJ's inference that claimant's pain was not as severe as he asserted). In this case, the record before the ALJ clearly established an inconsistency between Plaintiff's claims of inability to work and her objective ability to carry on with moderate daily activities, such as taking care of her personal needs, doing household chores, and driving her car. Her claims were also contradicted by the medical records. As the ALJ noted, the Plaintiff's medical records do not indicate that she told any of her treating physicians of experiencing grabbing pain several times each day. These symptoms are not supported by the clinical findings or the relatively mild treatment Plaintiff has received for her pulmonary condition. Her medical reports do not reflect complaints of limitations in standing, sitting, or lifting that she reported at her hearing. Her pulmonary tests do not reflect the degree of airflow limitation consistent with her allegations as to the extent to which her breathing problems limit her. In short, although the medical records establish that the Plaintiff experienced pain and mental and emotional difficulties to some extent, as the Fourth Circuit has noted, it is the ALJ's responsibility, not the Court's, "to reconcile inconsistencies in the medical evidence." Seacrist, 538 F.2d at 1056-57.

Finally, the Plaintiff alleges that having concluded that she was limited to performing unskilled work, the ALJ erred in relying on the Medical-Vocational guidelines to establish the availability of jobs existing in significant numbers in the national economy that the Plaintiff could perform. This assignment of error is baseless and ignores the clear purpose of the decisional grid contained in the Guidelines - to determine the existence of unskilled jobs that a claimant may perform taking into account her RFC and additional factors such as her age, educational level and past work experience. See 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(b) .

Generally, the Guidelines contain information about unskilled jobs classified by exertional

level. The ALJ applies those rules to determine if there are a significant number of jobs in the national economy that the person can perform when the person has only exertional limitations. 20 C.F.R. §§ 404.1569a(b) and 416.969a(b). If the individual also has nonexertional limitations, the Guidelines are used as a framework for making a decision. Whether they need to be supplemented by other vocational evidence depends upon the extent to which the nonexertional limitation reduces the base of jobs that are available at a given exertional level.

Otherwise, where nonexertional limitations have little effect in reducing the range of work reflected by the Guidelines, they can be used in deciding if there are a significant number of jobs an individual can perform. <u>See</u> Social Security Ruling 83-14 <u>and</u> Social Security Ruling 85-15.

In this case, the ALJ found that the only nonexertional limitation on the range of medium work Plaintiff could perform was a result of her mental and emotional impairments. This limited her to performing unskilled work As noted above, the Guidelines are based upon the existence of unskilled jobs and do not take into account semi-skilled or skilled jobs.

As the ALJ concluded, there are about 2,500 separate sedentary, light, and medium unskilled occupations in the national economy. These jobs do not require skills or previous experience and can be performed after a short demonstration or within thirty days. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 203.00. Thus, a limitation to "unskilled" work does not significantly impact the wide range of jobs considered at the medium exertional level of the Grid. Where, as in this case, an individual's RFC does not include nonexertional limitations that significantly impact the range of work that could be performed at a given exertional level, vocational testimony is not required. The ALJ could properly determine the issue of whether there existed a significant number of jobs in the national economy that Plaintiff could perform based on information in the Grid. <u>See</u> 20 C.F.R. §

404.1569a(b).

At the time of the ALJ's decision in October 2006, the Plaintiff was thirty-four years old (Tr. 58, 430), which placed her in the age category of being a "younger person." 20 C.F.R. §§ 404.1563(c) and 416.963(c). The Plaintiff indicated that she had a ninth grade education (Tr. 76) which the regulations classify as having a "limited education." 20 C.F.R. §§ 404.1564(b)(3) and 416.964(b)(3). The ALJ found that any skills Plaintiff may have acquired in her past relevant work were not transferable (Tr. 26). The ALJ properly relied upon the appropriate rules within the Grid that reflected Plaintiff's age, education and vocational experience as well as the functional capacity to perform unskilled medium, light, or sedentary work. The ALJ properly found that Plaintiff was "not disabled" based upon there being a significant number of jobs in the national economy that such a person could perform. See 20 C.F.R. Part 404, Subpart P, Appendix 2, Table 3, Rule 203.26; Table 2, Rule 202.18; and, Table 1, Rule 201.25.[6]

Simply put, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the Secretary's designate, the ALJ)." Mickles, 29 F.3d at 923, citing Simmons v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). This is precisely such a case, as it contains substantial evidence to support the ALJ's treatment of the medical records and ultimate determination that the Plaintiff was not disabled.

## IV. RECOMMENDATIONS

**FOR THE FOREGOING REASONS,** the undersigned respectfully recommends that

---

[6] Rule 201.25 indicates that even if the Plaintiff's impairments were so severe as to limit her to performing only unskilled sedentary work, she would be found "not disabled" because unskilled sedentary jobs exist in significant numbers in the national economy that a person of Plaintiff's age, education, and past work experience could perform.

Plaintiff's "Motion for Summary Judgment" (document #8) be **DENIED;** that Defendant's "Motion for Summary Judgment" (document #10) be **GRANTED**; and that the Commissioner's determination be **AFFIRMED.**

## V.  <u>NOTICE OF APPEAL RIGHTS</u>

The parties are hereby advised that, pursuant to 28 U.S.C. §636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same.  <u>Page v. Lee</u>, 337 F.3d 411, 416 n.3 (4th Cir. 2003);  <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1365 (4th Cir. 1989); <u>United States v. Rice</u>, 741 F. Supp. 101, 102 (W.D.N.C. 1990).   Failure to file objections to this Memorandum with the District Court constitutes a waiver of the right to <u>de novo</u> review by the District Court.  <u>Diamond v. Colonial Life</u>, 416 F.3d 310, 315-16 (4th Cir. 2005);  <u>Wells v. Shriners Hosp.</u>, 109 F.3d 198, 201 (4th Cir. 1997); <u>Snyder</u>, 889 F.2d at 1365.   Moreover, failure to file timely objections will also preclude the parties from raising such objections on appeal.  <u>Diamond</u>, 416 F.3d at 316; <u>Wells</u>, 109 F.3d at 201; <u>Page</u>, 337 F.3d at 416 n.3; <u>Thomas v. Arn</u>, 474 U.S. 140, 147 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 845-46 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties; <u>and to the Honorable Frank D. Whitney</u>.

**SO RECOMMENDED AND ORDERED**.

Signed: April 10, 2009

David S. Cayer
United States Magistrate Judge